RANDOLFO MARTY PÉREZ, demandante y apelado, *v.* TEMÍS-
TOCLES J. RAMÍREZ CUERDA, demandado y apelante.

Número 10929.

*Sometido:* 16 de octubre de 1953.   *Resuelto:* 28 de enero de 1954.

*Martín Avilés Bracero,* abogado del apelante; *José Castro Figueroa,* abogado del apelado.

EL JUEZ ASOCIADO SEÑOR ORTIZ emitió la opinión del tribunal.

El doctor Randolfo Marty Pérez radicó una demanda en cobro de dinero contra el doctor Temístocles J. Ramírez Cuerda, en la Sección de San Juan del anterior Tribunal de Distrito. El demandante embargó ciertos artículos e instrumentos utilizados en la profesión médica, alegando que pertenecían al demandado. Este último interpuso una moción "especificando bienes no susceptibles de embargo con arreglo a la ley y en solicitud de orden para su entrega". En esa moción el demandado exponía que su especialización profesional era la de cirujano; que bajo el inciso 4 del artículo 249 del Código de Enjuiciamiento Civil, están exentos de ejecución "los instrumentos y caja de éstos de un cirujano, médico, agrimensor y dentista, necesarios para el ejercicio de su profesión, con sus bibliotecas científicas y profesionales y las bibliotecas de legislación o profesiones y muebles de oficina de abogados, letrados, médicos y jueces, y las bibliotecas de los sacerdotes o ministros de cualquier religión", y que ciertos artículos embargados, especificados en la moción, eran necesarios para el ejercicio de su profesión de cirujano, exentos, por lo tanto, de embargo.

Se celebró una vista sobre esa moción y ambas partes presentaron prueba testifical y documental. El tribunal a quo finalmente dictó una resolución declarando sin lugar la moción ya mencionada, y basó su determinación en el criterio de que se había establecido por la prueba que los instrumentos y artículos objeto de la moción no pertenecían al demandado, y eran de la propiedad exclusiva del Hospital Sagrado Corazón, y que, por lo tanto, el demandado no podía alegar la exención

de tales artículos. El demandado ha interpuesto ante nos un recurso de apelación contra esa resolución.

■ Efectivamente, es errónea la resolución del tribunal de San Juan. Aunque es cierto que la prueba demostró que los instrumentos y artículos especificados no estaban localizados en la oficina particular del demandado, y sí estaban localizados en el Hospital Sagrado Corazón, también surge claramente de la prueba que el "Hospital Sagrado Corazón" pertenece exclusiva y personalmente al demandado; que el "Hospital Sagrado Corazón" no constituye una corporación o sociedad o entidad jurídica independiente sino que constituye meramente la designación o nombre comercial de una clínica perteneciente personalmente al demandado, y que tanto la clínica como su nombre, como los bienes en ella localizados, son de la propiedad del demandado. No se trata, como en el caso de *Melón Hnos. & Co., S. en C.,* v. *Muñiz de León,* 47 D.P.R. 91, de bienes embargados pertenecientes a una entidad jurídica distinta al demandado, sino de bienes del demandado localizados en un establecimiento perteneciente al demandado, aunque ese establecimiento tuviese un nombre especial a través del cual el demandado llevaba a cabo sus actividades profesionales. El demandado declaró que él era el propietario exclusivo del Hospital, y esa declaración quedó corroborada por un documento admitido en evidencia, que es un contrato celebrado entre las propias partes litigantes en este caso, el día 16 de septiembre de 1949. En dicho contrato el demandante y el demandado expusieron, en parte, lo siguiente:

"*Primero:* Que en el mes de octubre de 1947 los comparecientes acordaron la constitución de una sociedad para el establecimiento y funcionamiento de un HOSPITAL, y en el mes de FEBRERO de 1948 formalmente constituyeron la sociedad para el establecimiento de un Hospital y al efecto establecieron el Hospital conocido por '*Hospital Sagrado Corazón*' que desde entonces ha venido radicando y funcionando en la casa marcada con el número *1408* de la Avenida Ponce de León, Parada 21, de Santurce, Puerto Rico;

"*Segundo:* Que don Temístocles J. Ramírez Cuerda reconoce en este acto y así lo expone don Randolfo Marty Pérez que este último aportó a dicha Sociedad para el establecimiento y funcionamiento del 'Hospital Sagrado Corazón' la cantidad de DIEZ MIL TRESCIENTOS CUARENTA Y DOS DÓLARES ($10,342.00), moneda legal de los Estados Unidos de América;

"*Tercero:* Que el susodicho Hospital ha sido debidamente equipado con camas, muebles y demás enseres y efectos propios de un Hospital de su clase para cuyo objeto se empleó tanto el capital aportado por el Doctor Randolfo Marty Pérez como el aportado por el Doctor T. J. Ramírez Cuerda;

"*Cuarto:* Que en el mes de *mayo de 1948* fué convenido entre los comparecientes la disolución de dicha Sociedad y así fué disuelta en esa misma fecha bajo condición de que el Doctor Marty Pérez habría de conservar una oficina profesional en el mismo Hospital para la atención de sus pacientes particulares, sin costo alguno, y así mismo fué convenido que todo producto por concepto de hospitalización de esos mismos pacientes sería abonado al Dr. Marty Pérez en pago parcial de su crédito ascendente al importe por él contribuído para el establecimiento y funcionamiento del Hospital Sagrado Corazón;

"*Quinto:* Finalmente exponen los comparecientes que desde el mes de mayo de 1948 en que quedara disuelto, el convenio habido entre ambos ha venido funcionando· en todas sus partes, *apareciendo desde entonces el Doctor T. J. Ramírez Cuerda como único dueño del 'Hospital Sagrado Corazón'* y reconociendo éste a su vez que el Doctor R. Marty Pérez es un acreedor preferente, por la suma que más adelante se consigna, sobre el referido Hospital con todo su equipo, y reconociendo el Doctor R. Marty Pérez, por su parte, que desde dicha fecha todos sus derechos y acciones han venido cedidos y traspasados a favor del otro compareciente.

"Deseando ahora los comparecientes ratificar dicha disolución de sociedad, reconocer y ratificar la cesión y traspaso de los derechos y acciones consiguientes, el reconocimiento formal de la deuda según ha quedado reducida hasta esta fecha, y las demás condiciones y estipulaciones del contrato, todo lo llevan a cabo por medio del presente documento y bajo las cláusulas siguientes:

"*Primera:.* Los comparecientes expresamente ratifican la disolución de la Sociedad por ellos constituída para el estableci-

miento, equipo y funcionamiento del 'Hospital Sagrado Corazón', en mayo de 1948, y el Doctor Randolfo Marty ratifica la cesión y traspaso de todos sus derechos y acciones sobre el susodicho Hospital a favor del Doctor Temístocles J. Ramírez Cuerda, y a mayor abundamiento por la presente *cede y traspasa* todo derecho y acción y todo condominio que pueda tener y tenga sobre el 'Hospital Sagrado Corazón' *a favor del Doctor T. J. Ramírez Cuerda;*

*"Segunda:* Los otorgantes reconocen expresamente que dicha cesión y traspaso se hizo por el convenido precio de DIEZ MIL TRESCIENTOS CUARENTA Y DOS DÓLARES ($10,342), moneda legal de los Estados Unidos de América, o sea el importe de su aportación del Dr. Marty Pérez para el establecimiento, equipo y funcionamiento del susodicho Hospital;

*"Tercera:* El Doctor Randolfo Marty Pérez reconoce expresamente que hasta esta fecha y por concepto del producto de hospitalización de sus pacientes particulares y privados en dicho Hospital tiene recibida la cantidad de UN MIL CINCUENTA Y UN DÓLARES ($1,051) ; quedando así reducida la deuda a la cantidad de NUEVE MIL DOSCIENTOS NOVENTA Y UN DÓLARES ($9,291) ; y el Dr. Ramírez Cuerda expresamente reconoce y confiesa que viene adeudando y adeuda hasta esta fecha y por el concepto expresado, o sea por el precio de venta de una participación en el Hospital Sagrado Corazón, al Doctor Marty Pérez la indicada cantidad de NUEVE MIL DOSCIENTOS NOVENTA Y UN DÓLARES ($9,291), moneda legal de los Estados Unidos de América.

*"Cuarta:* Como parte del convenio al disolverse la sociedad, queda convenido que el Dr. Marty Pérez tendrá derecho a seguir ocupando una oficina en el propio local de dicho Hospital para atender a sus pacientes privados y particulares, y por su parte el Doctor Ramírez Cuerda se obliga a seguir abonando al Doctor Marty Pérez todo el producto que por concepto de hospitalización rindan dichos pacientes privados o particulares del Doctor Marty Pérez en dicho Hospital Sagrado Corazón;

*"Quinta:* Queda así mismo convenido que dicha deuda de $9,291 será cubierta en la forma que fuera convenida mientras continúe el funcionamiento del susodicho Hospital Sagrado Corazón, pero queda convenido y estipulado que en caso de que dicho Hospital fuere cerrado y descontinuado su funcionamiento, el importe de la deuda que a dicha fecha exista a favor del Doctor Marty Pérez en virtud de esta cesión y traspaso será considerado como crédito preferente sobre toda otra deuda, y todo el

equipo, muebles, camas y enseres del mismo responderán en primer término al pago del remanente que se adeudare de la presente deuda o sea de la liquidación que resulte después de abonar todo el producto de hospitalización que hubiere pendiente de liquidación a la fecha del cierre o cese del funcionamiento del Hospital;" (Bastardillas nuestras.)

El propio demandante admitió contractualmente que el Hospital Sagrado Corazón era propiedad exclusiva del demandado y la prueba presentada ante el tribunal ratificó claramente esa realidad. El demandado así lo declaró personalmente. El demandante meramente expuso que los bienes embargados eran propiedad del Hospital. Pero el Hospital, a su vez, era propiedad del demandado. Fué errónea la resolución del tribunal de San Juan.

■■ El tribunal a quo no formuló pronunciamiento alguno en cuanto a si los artículos cuya exoneración del embargo se solicitaba eran o no necesarios para el ejercicio por el demandado de su profesión de cirujano. Pero hubo prueba incontrovertida en cuanto al uso específico y la necesidad intrínseca de esos instrumentos. Antes de determinar la aplicabilidad al caso de autos del inciso 4 del artículo 249 del Código de Enjuiciamiento Civil, ya citado, procede la adopción de una perspectiva general. Tal como se indica en 22 Am. Jur. 7, sección 4, "las leyes de exención son el producto de una noble política pública, que trata de lograr alguna medida de protección a un deudor y a su familia e, incidentalmente, al público. Se han adoptado, no para fines exclusivos de benevolencia, sino que también para promover el interés del estado en el bienestar de sus ciudadanos. Su propósito humano y generoso es el de establecer alguna seguridad de los deudores contra litigios molestosos, y el de protegerlos en el ejercicio de aquellas actividades que sean necesarias para la existencia y el bienestar de la comunidad. Al permitir a un deudor el retener cierta propiedad libre de molestias y de incautación de parte de sus acreedores, esas leyes le extienden a él la oportunidad de sostenerse a sí mismo, para que no se conviertan

en cargas públicas. Todo hombre, aun el más extravagante y pródigo, tiene un deber esencial a aquéllos que dependan de él inmediatamente. También, es el interés del estado el que ningún ciudadano sea reducido a tal condición de desamparo que se vea impedido de dedicarse a actividades útiles para las cuales él esté debidamente preparado, y el que la familia de un deudor no se vea privada, por extravagancia o infortunio de la protección necesaria para la salud y la actividad. Tales leyes estimulan la industria, la economía y el establecimiento de hogares, mediante el proceso de colocar en una posición inaccesible para los acreedores tales bienes o propiedades que el deudor pueda necesitar para llevar a cabo sus labores o negocios, no importa cuál sea su ocupación o condición en la vida. Es preferible que algún acreedor no sea resarcido a que se le prive al deudor y a su familia aquello que los legisladores consideraron esencial para su educación, cultura y desarrollo espiritual. Pero no ha sido el propósito de las leyes de exención el ayudar innecesariamente a los deudores, el evitar el pago de sus deudas legítimas y no deberían convertirse en un medio de permitir a los deudores el escapar de sus obligaciones que surjan después que ellos hayan dejado de colocarse dentro del ámbito de las leyes de exención."

En vista de esos postulados de elevada política social, las leyes de exención deben ser interpretadas liberalmente en beneficio de los deudores y en forma favorable a los objetivos y propósitos de la exención. *Quiñones* v. *Gutiérrez et al.*, 29 D.P.R. 772; *Laguna* v. *Quiñones*, 23 D.P.R. 387; *Wilder* v. *Inter-Island Navigation Co.*, 211 U. S. 239; *Holmes* v. *Marshall*, 145 Cal. 777; *In re Estate of L. McManus*, 87 Cal. 292; 22 Am. Jur. 9. En el caso de *Laguna* v. *Quiñones*, supra, se dijo, en parte, lo siguiente:

"Se resolvió por la Corte Suprema de California en el caso de *In re Estate of McManus*, 87 Cal. 292, 10 L.R.A. 567, que los estatutos que eximen a la propiedad mueble de ejecución por venta obligatoria son reparadores por naturaleza y el objeto de los mismos es claramente proteger al deudor, proporcionarle el

medio de continuar su oficio y ganar así su subsistencia y la de su familia. La regla general ahora es que tales estatutos deben ser interpretados en sentido liberal para llevar a efecto el propósito humanitario que tuvo en cuenta el legislador. No solamente se da a los estatutos una interpretación liberal, sino que se ha declarado que las palabras 'herramientas e instrumentos' son aplicables a efectos que estarían excluídos por una estricta interpretación técnica."

De existir dudas en cuanto a si determinada propiedad está exenta, la tendencia judicial debe ser la de resolver las dudas en favor de la exención. *Hoyt* v. *Pullman*, 152 Pac. 386. Las exenciones no deben ser interpretadas estrictamente. Sin embargo, las exenciones no deben ser ampliadas judicialmente más allá de lo dispuesto en el estatuto. 22 Am. Jur. 10. Y siempre debe tenerse en cuenta el criterio de razonabilidad, esto es, el número de artículos exonerados no debe ser excesivo, hasta el punto de que trasciendan los límites de una necesidad razonable.

█ El concepto de "instrumentos necesarios" utilizado en el artículo 249 no implica el que tales instrumentos tengan que ser indispensables o absolutamente necesarios para que el deudor pueda llevar a cabo sus actividades (22 Am. Jur. 30), pero es suficiente el que los instrumentos sean razonablemente necesarios, convenientes o adecuados para llevar a cabo la actividad en cuestión en forma ventajosa y útil. *Laguna* v. *Quiñones*, supra, 22 Am. Jur. 30. Generalmente, aquellos artículos sin los cuales el deudor no puede trabajar en su profesión deben caer dentro de la exención. 2 A.L.R. 818; 9 A.L.R. 1020; 36 A.L.R. 669; 52 A.L.R. 826. Además, el concepto de "instrumentos necesarios" no debe tener un contenido fijo e invariable. El progreso en la ciencia médica moderna implica una connotación más amplia en cuanto a los instrumentos que puedan ser necesarios para un cirujano en la actualidad.

Aplicando los principios anteriormente señalados a las circunstancias específicas de este caso, en la moción de exo-

neración de embargo presentada por el demandado se alega que el demandado es un cirujano, y que determinados instrumentos son necesarios para el ejercicio de su profesión especializada. Los instrumentos señalados son los siguientes: una mesa de operaciones y exámenes; una mesa de maternidad; dos mesas para instrumentos; un "Utensil Stand"; un juego de autoclaves; una BPE lámpara de emergencia; dos lamparitas germicidal; seis "Bassinets"; un metro para oxígeno; una incubadora; dos sitios para colocar instrumentos; dos "Kickbuckets"; dos taburetes o "stools"; un receptor de inmersión; dos aparatos de irrigación; un sillón o cama rodante; un esterilizador de instrumentos; dos mesitas de anestesia; dos cajas para instrumentos y material; una nevera pequeña y una unidad de succión. El demandado declaró ampliamente y en detalle en cuanto a la necesidad esencial de esos artículos para un cirujano. Efectivamente, esos artículos constituyen instrumentos razonablemente necesarios para el ejercicio de la profesión de cirujano, dentro de las realidades actuales de esa profesión, y tales instrumentos deben estar exentos de embargo.

En el caso de *De Coster* v. *Nenno et al.*, 213 N. W. 538, la Corte Suprema de Minnesota resolvió que el equipo y los aparatos localizados en un hospital moderno, siendo ese hospital propiedad exclusiva de un cirujano, no deben estar exentos de embargo y ejecución. Se señala que es muy costoso el equipar un hospital moderno, y que no pudo haber sido la intención legislativa el exonerar de ejecución todo el equipo de tal hospital, ya que, de lo contrario no habría límites en cuanto a la cantidad de dinero invertida en un hospital, y a la exención solicitada. Pero en ese caso lo que se establece es una limitación de razonabilidad, rechazándose la exención en cuanto a todo el equipo de un hospital. No se resuelve que por el hecho de que ciertos artículos específicos estén localizados en un hospital, ello implique la negativa de la exención. En el caso de autos no se pretende la exención en cuanto a la totalidad de las propiedades y artículos localizados en el Hospital

Sagrado Corazón. Se limita la petición de exención a un número limitado de instrumentos básicos esenciales, y razonablemente necesarios para el ejercicio de la profesión de cirujano.

■ Se podría alegar que el contrato firmado entre las partes conlleva una renuncia (*waiver*) de la exención de parte del deudor y demandado. En ese contrato se indica que el demandante y el demandado eran condueños de las propiedades en el hospital, incluyendo el equipo e instrumentos aquí envueltos y que el demandante le vende y cede su participación en esas propiedades al demandando. Se indicó en el contrato que "el Doctor T. J. Ramírez Cuerda, es el único dueño del 'Hospital Sagrado Corazón' y reconociendo éste a su vez que el Doctor R. Marty Pérez es un acreedor preferente, por la suma que más adelante se consigna, sobre el referido Hospital, con todo su equipo" y que "el importe de la deuda . . . será considerado como crédito preferente sobre toda otra deuda, y todo el equipo, muebles, camas y enseres del mismo responderán en primer término al pago del remanente que se adeudare de la presente deuda".

El argumento sería que el deudor colocó voluntariamente los bienes aquí embargados al acceso de una reclamación judicial por el demandante, incluyendo el procedimiento de ejecución, dando ello lugar a una renuncia de la exención. Ahora bien, la doctrina generalmente aceptada, que nosotros adoptamos, es al efecto de que es absolutamente nula la renuncia de una exención, hecha por el deudor en un contrato previo, a ser cumplido en el futuro (*executory contract*). 35 C.J.S. 133; 22 Am. Jur. 99. En el caso de *Industrial Loan and Investment Co.* v. *Superior Court*, 209 P. 360, 189 Cal. 546, se resolvió que es inválida una renuncia *expresa* de una exención hecha anticipadamente por el deudor en un pagaré que le sirvió de base a la reclamación. Se dijo lo siguiente, después de indicarse que generalmente una exención es un privilegio personal del deudor:

"Pero esa regla no es aplicable a las estipulaciones contenidas en un contrato a ser cumplido en el futuro, como el que le sirve de base a la reclamación en este caso. En cuanto a esos casos, la regla es que el deudor no puede renunciar anticipadamente su derecho a reclamar la exención. Esa regla está basada en la teoría de que las leyes de exención se han hecho en beneficio del deudor y de su familia, y que es contrario al interés público el permitir al deudor el renunciar a la exención antes de que surja la necesidad de reclamarla. Si no fuera por esa regla, se dice, los acreedores insistirían en incluir una cláusula de renuncia de exenciones en todos los contratos a ser cumplidos en el futuro. Ello se haría en la ocasión en que el deudor estaría bajo la necesidad de obtener dinero, y tal renuncia sería luego efectiva cuando el deudor o su familia requiriesen los beneficios de la exención. El permitir eso implicaría el permitir una renuncia de todos los beneficios concedidos por las leyes de exención. Aprobamos esa doctrina (prohibitoria de las renuncias) y resolvemos que tal renuncia no puede ser efectiva. *Esa doctrina ha sido seguida por todos los Estados menos Pennsylvania."* (Bastardillas nuestras.)

Efectivamente, la doctrina que ahora adoptamos está inspirada en el propósito de mantener la integridad y proteger la política pública fundamental encarnada en las leyes de exención; de proteger a la familia del deudor, y al propio deudor, contra su improvidencia e imprevisión, y el de no permitir que los beneficiarios de la ley echen abajo personalmente los cimientos de la estructura de exención que la comunidad ha erigido legislativamente.

■ El artículo 249 de nuestro Código de Enjuiciamiento Civil, después de establecer la exención envuelta en este litigio, dispone lo siguiente, por vía de excepción.

"Ninguno de los objetos o clases de bienes mencionados en este artículo, está exento de orden de ejecución *librada en virtud de sentencia,* para el cobro de su valor, precio o del importe de una hipoteca sobre dichos bienes." (Bastardillas nuestras.)

No puede alegarse una exención de determinados artículos contra una sentencia basada en una reclamación por el precio de compra de esos artículos. Pero el artículo 249 taxativa-

mente exige, para que se derrote la exención, que la reclamación por el precio se haya reducido previamente a sentencia. La excepción no surge de la reclamación en sí, sino de la sentencia. El propósito de la distinción es claro. Un deudor no debe perder el uso de ciertos artículos necesarios y esenciales para que él se pueda ganar la vida, por el mero hecho de que se entable una reclamación cuya validez, virtualidad y autenticidad aún esté en dudas. La sentencia previa le imprime autenticidad a la reclamación, y hace más factible el privar al deudor de la exención. En el caso de autos la reclamación del demandante aún no ha sido reducida a sentencia y, por lo tanto, no es aplicable la disposición citada del artículo 249.

Incidentalmente, el artículo 249 no reconoce la exención contra el tenedor de una hipoteca sobre los mismos bienes. El contrato celebrado entre las partes no constituye una hipoteca. No podría alegarse que el lenguaje usado en el contrato da lugar a un gravamen preferente sobre los bienes, derrotándose así la exención, ya que el único gravamen autorizado por la ley como vehículo de excepción a la exención es el de la hipoteca. El señalamiento de una clase de gravamen excluye las otras clases de gravámenes como medio de derrota de la exención.

*Debe anularse y dejarse sin efecto la resolución apelada y, en su lugar, debe declararse con lugar la moción del demandado de 23 de abril de 1951, de exención del embargo trabado de "bienes no susceptibles de embargo", debiendo devolverse el caso a la Sala de San Juan del Tribunal Superior para que allí se sigan los procedimientos posteriores que no sean incompatibles con esta opinión.*

El Juez Asociado Sr. Negrón Fernández no intervino.

Los Jueces Asociados Sres. Sifre y Pérez Pimentel concurren con el resultado.